**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **LEE ANN MASON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No.   13-550-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Defendant.** | ) | |
| | ) | |

# MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Lee Ann Mason is before the Court, represented by counsel, seeking judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income (SSI) benefits. For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Lee Ann Mason previously received a partially favorable decision in September 2009 that found she was disabled from August 25, 2007 through November 30, 2008 (Tr. 228). Mason then applied for SSI in July 2010 alleging disability due to back pain, bipolar disorder, and anxiety disorder since August 25, 2007 (Tr. 165).   Mason's application for SSI was denied at the initial stage and on reconsideration.   After holding an evidentiary hearing, Administrative Law Judge (ALJ) Kim Nagle denied the application for benefits in a

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (Doc. 10).

decision dated March 7, 2012 (Tr.17–30).   Mason's request for review was denied by the Appeals Council, and ALJ Nagle's decision became the final agency decision (Tr. 1). Mason has exhausted her administrative remedies and has filed a timely complaint in this court seeking judicial review of the ALJ's adverse decision.

## APPLICABLE LEGAL STANDARDS

**A.      Disability Standard**

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes. [2]   For these purposes, "disabled" means the claimant is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 1382c(a)(3)(A).   A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. § 1382(d). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities for pay or profit.   20 C.F.R. § 416.972.

The Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   20 C.F.R. § 416.920(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).   If the ALJ determines that the claimant is disabled or not disabled  at any step of the five-step  inquiry, the  inquiry  ends  without proceeding to the next step.   20 C.F.R. § 404.920(a)(4).

The first step considers whether the claimant is presently unemployed.   20 C.F.R. §

---

[2] The statutes and regulations pertaining to Supplemental Security Income (SSI) are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.

416.920(a)(4)(i).   If the answer is "no," the claimant is not disabled and the inquiry is over; if the answer is "yes," the inquiry proceeds to the next step.   *Id.*   The second step evaluates whether the claimant has an impairment or combination of impairments that is severe, medically determinable, and meets the durational requirement.   20 C.F.R. § 416.920(a)(4)(ii).   Again, if the answer is "no," the claimant is not disabled and the inquiry is over; if the answer is "yes," the inquiry proceeds to the next step.   *Id.*   The third step analyzes whether the claimant's severe impairment(s) meet or equal one of the listed impairments acknowledged to be conclusively disabling.   20 C.F.R. § 416.920(a)(4)(iii). If the answer is "yes," the claimant is automatically deemed disabled; if the answer is "no," the inquiry proceeds to the next step.   *Id.*

Before continuing to step four, the claimant's residual functional capacity ("RFC") is assessed.   20 C.F.R. § 416.920(a)(4).   The fourth step assesses whether the claimant can perform past relevant work given his or her RFC.   20 C.F.R. § 416.920(a)(4)(iv).   If the answer is "yes," the claimant is not disabled and the inquiry is over; if the answer is "no," the inquiry proceeds to the next step.   The fifth and final step assesses whether the claimant can perform other work given his or her RFC, age, education, and work experience.   20 C.F.R. § 416.920(a)(4)(v).   If the answer is "yes," the claimant is not disabled and the claim is denied.   *Id.*   On the other hand, if the answer is "no," the claimant is deemed disabled.   *Id.*

**B.     Judicial Review**

The scope of judicial review of the Commissioner's decision is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."   42 U.S.C. § 405(g).   Thus, the Court must determine not whether Mason was in fact disabled, but whether the ALJ's findings were supported by

substantial evidence and whether any errors of law were made.   *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence.")

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but the Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   In addition to supporting the decision with substantial evidence, the ALJ must also include an adequate discussion of the issues and "build an accurate and logical bridge" from the evidence to each conclusion.   *Berger v. Astrue*,  516 F.3d 539, 544 (7th Cir. 2008).

While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).   "If a decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required."   *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded.")

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by Mason in her complaint and addressed in this Order.

**A.     Mason's Background and DIsability Allegations**

Mason submitted a number of forms to the Social Security Administration, including a Function Report, a Physical Impairments Questionnaire, a Work History Report (Tr. 161–210).   Mason also testified at an evidentiary hearing in front of ALJ Nagle on February 28, 2012 (Tr. 36–70).   The following is a summary of Mason's background and allegations regarding her disability as presented on the agency forms and at the evidentiary hearing.

Lee Ann Mason was born in June 1976 and was 31 years old on the alleged onset date—August 25, 2007.   She is 5 feet, 5 inches tall, and she weighed approximately 145 pounds at the time of the evidentiary hearing.   Mason lives in Shumway, Illinois with her husband and her daughter who was seven years old at the time of the evidentiary hearing.

Mason graduated from high school and finished one year of college.   She does not have any vocational training or military experience.   She has an erratic work history, and between 1996 and 2003, she drew a paycheck from 34 different employers (Tr. 147–51).   Despite the number of jobs she has had, Mason has only made a total of approximately $33,000.00 in her entire lifetime (Tr. 147–51).   Her past relevant work includes working as a cashier/food preparer at a gas station and as a waitress.   She last worked on a full-time basis in 2003.   She left her job due to pregnancy complications, and she did not look for work after giving birth to her daughter.   In 2006, she worked as a cashier at a gas station for one day, but then quit because "[she] just didn't feel like it." (Tr. 41).

Mason has had back pain all day, every day since 2007.   The pain is in her lower back and down her right leg; she also has numbness in her toes.   She can only sit for about 45 minutes to an hour before she has to get up and move around or lay down.   She also said that she "can only do so many things around the house" before she needs to lie down to

relax her back.   For a number of years, Mason has taken a muscle relaxer and used a fentanyl patch to relieve the pain.   When she has break through pain, she uses Vicodin or Tylenol 3 with codeine.

Mason also takes medication for her mental impairments.   These medications are "always changing," however, because "we haven't got my medication right."   She has days when she is extremely high, days when she is extremely low, and in-between days.   She explained that she experiences low days the most, high days the second most, and in-between days the least.

During the day, Mason does chores around the house, including unloading and loading the dishwasher, dusting, and folding clothes.   She drives her daughter to and from the bus stop every day.   Her family has one dog and five cats that she cares for.   Mason indicated that four other people, including her husband, help her take care of her daughter and the pets.   Two to three times a week, she cooks simple meals, such as frozen dinners, sandwiches, or Hamburger Helper.   She goes to the store once or twice a month.   Mason watches television during the day, but most of the time she is not able to follow the plot. She also does not pay bills, use the checkbook, or handle the bank accounts because she cannot concentrate to do so.

Mason explained that her daily activities depend on her mood.   When she is hypomanic, she tries to keep busy because she is highly agitated, has trouble concentrating, and cannot sit down.   She showers and brushes her teeth.   She cooks, cleans, folds laundry, prepares dinner, etc.   However, she takes a 15–20 minute break after each chore and lies down because if she does not take breaks then she is in extreme pain for two to three days afterwards.   During a depressive episode, she lays on the couch or in bed all day.   She goes three to six days without changing her clothes, showering, or brushing her

teeth, and she only does so when her husband tells her that her hair is greasy and she has body odor.   She still does household chores, but her husband has to tell her to do them. She still takes her daughter to and from the bus stop; however, she only has to drive two blocks, she stays in her pajamas, and she sets an alarm to remind her to do both.   She also still takes her dog out because otherwise her daughter or husband will have to clean up a mess in the house; again, she stays in her pajamas when she takes her dog out.

Mason's daughter and her husband are the primary people that she socializes with. She also goes to her mother's house or her sister's house once or twice a month.   She does not socialize with anyone else.   When she is hypomanic, it is difficult to interact with people.   For example, she explained that she talks extremely fast and it is difficult for others to follow along.   Additionally, when someone is speaking to her, she will see their mouth moving and hear the words, but she does not comprehend what they are saying. She also has difficulty interacting with people when she is depressed.   She said that she does not want to be around people or talk to people.    She often does not answer her phone. When her husband and daughter come home from work and school, she retreats to the bedroom.   She does not help her daughter with homework or make her a snack.

**B.    Medical Records**

Mason receives primary care at the Cowden Medical Clinic in Cowden, Illinois from Cindy Rich, a nurse practitioner.   Mason began going to the Cowden Medical Clinic in 2006, however, there are virtually no medical records from the clinic prior to 2009 (Tr. 436, 723).   Between January 2009 and January 2012, Mason saw Ms. Rich more than once a month, with very few exceptions.    At least one visit a month was related to her back pain.

According to the records, Mason has had back pain since at least 2005 (*See* Tr.

Page 7 of 28

696).   At that time, an MRI revealed that she had mild degenerative disc disease with minimal disc bulges from the L2–L3 through L5–S1, but no central canal or neural foraminal stenosis (Tr. 696).   Her condition worsened over time (*See* Tr. 766, 784–85). An MRI in October 2010 revealed disc dehydration and disc bulges at multiple levels, an annular tear at L5, facet arthropathy at multiple levels causing indentation on the thecal sac and mild narrowing of the foramina (Tr. 760–61).   It also revealed mild displacement of the nerve root at L3–L4 and L4–L5 (Tr. 761).   Because this Order focuses on Mason's mental impairments, most of the medical records regarding Mason's back pain are not particularly relevant, and therefore a very brief summary will suffice.   Mason has seen a number of doctors for her back pain, including pain management specialists and neurosurgeons (*See* Tr. 706).   She has tried a number of treatments to alleviate her pain including physical therapy, chiropractic therapy, over-the-counter pain relievers, prescription pain relievers, pain reliever injections, oral steroids, and epidural steroid injections (Tr. 386, 407, 409, 706, 818, 827).   Since January 2009, Mason has used a fentanyl patch for her back pain (Tr. 437–38).   In November 2010, Mason was told that she is not a candidate for surgery because there is no evidence of nerve root compression and no indication that her condition is unstable (Tr. 789–90).

In addition to her back pain, Mason has a long history of mental impairments.   She was hospitalized for several days at Sarah Bush Lincoln Health Center in 1997 and 2001 for depression and suicidal ideations (Tr. 258–79; 280–303).   Between 2001 and 2008, it is clear that Mason received psychiatric care, however due to a lack of records from this time period, it is not clear who she saw, how frequently she saw them, or what specific treatments she received (*See* Tr. 720–21).

In June 2008, Cindy Rich referred Mason to Heartland Human Services ("HHS") for

psychiatric services (Tr. 720–21).   Mason met with Dr. Stephanie van Ulft, a psychiatrist, who thought Mason's most likely diagnosis was Bipolar Disorder II with a history of substance abuse (Tr. 721).   Mason described periods of depression where she had low mood, poor concentration, increased anxiety, sleep problems, was tearful, and overate (Tr. 720).   She also described period where she felt "hyper" and stayed up late, had racing thoughts, engaged in risky activities, and went shopping more frequently (Tr. 720).   By this time, Mason had tried a number of psychiatric medications including Effexor, Cymbalta, Prozac, Celexa, Serzone, Zoloft, Paxil, Elavil, Trazodone, Wellbutrin, Xanax, Ativan, Klonopin, Vistaril, Zyprexa, and Seroquel (Tr. 720).   However, some of the antidepressants caused her to become more manic (Tr. 721).   Dr. van Ulft restarted Mason on Zyprexa as a mood stabilizer because Mason recalled doing well in the past on that medication; she also continued Mason's prescription for Xanax (Tr. 721).

Following Mason's initial visit with Dr. van Ulft, there are no records from HHS through December 2008; however, subsequent records reveal that Mason was seen on a number of occasions (*See* Tr. 322, 327).   The records from January 2009 through January 2012 reveal that Mason continued to receive psychiatric services on a regular and consistent basis.

Mason had regular therapy appointments with Barbara Proctor, MA, LCPC, QMHP. Mason saw Ms. Proctor on at least 20 occasions between January 2009 and January 2012, and the record suggests that her appointments with Ms. Proctor would have been even more frequent but for Mason's financial constraints (*See, e.g.,* Tr. 335).   In addition to therapy appointments with Ms. Proctor, Mason regularly saw a psychiatrist for management of her medications.   She saw Dr. van Ulft five times in a seven month span from January to July 2009 (Tr. 327–42, 991).   Dr. van Ulft assigned Mason GAF ratings

between 55–65 on four occasions and maintained her diagnosis as Bipolar II.   However, during this same time period, Ms. Proctor assigned a GAF rating of 50 on two occasions and indicated Mason's diagnosis was Bipolar I, most recent episode depressed, moderate (Tr. 319, 322).

In August 2009, after Dr. van Ulft had left HHS, Mason began seeing a new psychiatrist, Dr. Elbert Lee, at Sarah Bush Lincoln Health Center (Tr. 495).   At the initial visit, Dr. Lee gave Mason a GAF score of 50 (Tr. 495).   Mason saw Dr. Lee 10 more times over the next 15 months (Tr. 480–95; 543–48).   For the first 12 months, Mason maintained a diagnosis of Bipolar II.   However, at one point in December 2009, Ms. Proctor indicated that Mason's diagnosis was Bipolar I, most recent episode depressed, moderate (Tr. 316).   At the same time, Ms. Proctor assigned a GAF rating of 64 (Tr. 316). In August 2010, Dr. Lee updated Mason's diagnosis to Bipolar Disorder Not Otherwise Specified (Tr. 480–95; 543–51; 992–94).   In September 2010, Dr. Lee added a diagnosis of panic disorder without agoraphobia (Tr. 546–48).

In December 2010, Mason switched back to a psychiatrist at HHS (*See* Tr. 586; 588–90).   That month, she saw Dr. Pat Kinne for the first and only time (Tr. 588–90).   In March 2011, Mason saw Dr. Manoher Bearelly for the first time (Tr. 861).   She saw Dr. Bearelly eight more times over the next 10 months (Tr. 861–65, 905–09).   Initially, Dr. Bearelly listed Mason's diagnoses as Bipolar I, currently hypomanic and post-traumatic stress disorder; Dr. Bearelly further noted that Mason had "Cluster B personality traits/likely borderline personality [disorder]" (Tr. 861).   At the third visit in April 2011, Dr. Bearelly dropped the personality disorder diagnosis (*See* Tr. 905).   At the fifth visit in August 2011, Dr. Bearelly indicated Mason's diagnoses "by history" included Bipolar Disorder Not Otherwise Specified and Caffeine Induced Anxiety Disorder (Tr. 918).   Dr.

Bearelly continued to use these diagnoses throughout the remaining visits (Tr. 921, 941–47).   During this same time period, Ms. Proctor indicated twice that Mason's diagnosis was Bipolar II, and assigned a GAF rating of 57 on three occasions (Tr. 864, 902, 933, 934).

Between from January 2009 to January 2012, Mason's psychiatric medications were changed, or the dosages were adjusted, on a near constant basis, sometimes because of intolerable side effects, and other times because of continuing or worsening symptoms. Mason tried a number of new psychiatric medications including, Geodon, Seroquel, Lamictal, Abilify, Remeron, Depakote, Lithium, and Buspar.   She also retried a number of psychiatric medications that she had previously used, including Wellbutrin, Effexor, Trazodone, Xanax, and Cymbalta which she augmented with Folate and Vitamin B-12. She also used Ambien for sleep.

Despite taking medication and attending therapy, Mason's condition was not stabilized and she continued to experience psychiatric symptoms (*See* Tr. 586, 865, 934). For example, at counseling sessions in the year prior to the administrative hearing, Mason reported struggling with "ups and downs" (Tr. 907), "not doing well" (Tr. 910), feeling "stressed out" (Tr. 917), feeling like "I will jump out of my skin" (Tr. 923), increased anxiety (Tr. 910, 923, 927), feeling manic (Tr. 920), memory problems (Tr. 917, 956), concerns with depression (Tr. 907, 923), suicidal ideations (Tr. 923), difficulty handling stressors (Tr. 859, 860, 924), problems with her husband (Tr. 907, 920, 923, 924), and irregular sleeping habits (Tr. 923, 943, 945).

In addition to Mason's self-reports, Ms. Proctor recorded her own observations of Mason's depressive symptoms, such as negative thought patterns (Tr. 907), lack of confidence (Tr. 907), isolation (Tr. 859, 923), lack of motivation and the need for

prompting or encouragement (Tr. 859, 907, 923, 924), and feelings of worthlessness (Tr. 920).   At other times, Ms. Proctor observed that Mason was preoccupied and distracted (Tr. 910), noticeably manic (Tr. 917, 923), had irrational thoughts and beliefs (Tr. 860), lacked communication skills (Tr. 920, 923), had difficulty handling her symptoms and stressors (Tr. 859, 860, 907, 910, 915, 917, 920, 924), and needed to develop coping skills (Tr. 859, 860, 907, 910, 915, 917, 920, 924).

On March 29, 2011, approximately eleven months prior to the administrative hearing, Ms. Proctor completed a Mental Functional Capacity Report which Dr. Bearelly signed off on six days later (Tr. 864–65).   They opined that Mason was *markedly* limited in activities of daily living; according to the form that meant Mason has "serious difficulty performing ADLs without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions."   They opined that Mason was also *markedly* limited in social functioning; according to the form that meant Mason exhibited "behaviors that are not acceptable in the course of dealing with supervisors, co-workers, or the public.   Factors considered are such as social isolation, avoidance of interpersonal relationships, fear of strangers, altercations, evictions, or firings."   Ms. Proctor and Dr. Bearelly further opined that Mason was *extremely* limited in concentration, persistence, and pace; according to the form that meant Mason "cannot complete tasks without extra supervision or assistance or in accordance with quality and accuracy standards or at a consistent pace without an unreasonable number and length of rest periods or without undue interruptions or distractions."   Ms. Proctor and Dr. Bearelly indicated that Mason had experienced 4 or more episodes of decompensation in the previous year and estimated that she would be absent more than three times a month due to her impairments or treatment.   They explained that their opinion was based on the fact

that Mason's mood disorder has not be stabilized completely and [she] has episodes of marked hyper-arousal, jitteriness, and poor concentration."   They further explained that "her physical limitations exagerate [sic] her mental health concerns."

## C.   Consultative Examinations & State Agency RFC Assessments

In September 2010, the state agency had Mason evaluated by Vittal Chapa, an internist (Tr. 506–11).   The following month, a state-agency medical consultant, Richard X. Smith, reviewed Mason's medical records and completed a Physical RFC Assessment (Tr. 71–78).   Because this Order focuses on Mason's mental impairments, it is not necessary to detail the results of Dr. Chapa's report or Dr. Smith's assessment.

The state agency also had Mason evaluated by Jerry L. Boyd, a clinical psychologist, in September 2010 (Tr. 499–503).   The examination lasted 40 minutes.   Boyd diagnosed Mason with bipolar disorder; poly-substance and alcohol dependence, both in reported remission; generalized anxiety disorder with panic attacks; and personality disorder with avoidant and borderline features.   He assigned a GAF score of 50.   He found that Mason was an adequate communicator and could follow moderately complex instructions.   He further found that Mason had "a markedly reduced stress tolerance and reduced initiative and persistence," and that she remained unconfident and avoidant despite medication and mental health treatment.

The following month, a state-agency medical consultant, Joseph Mehr, Ph.D., reviewed Mason's medical records but did not examine her, and completed a Psychiatric Review Technique Form and a Mental RFC Assessment (Tr. 513–30).   Mehr opined that Mason was moderately limited in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace (Tr. 523).   He further opined that Mason had suffered no episodes of decompensation of extended duration (Tr. 523).   Mehr

then completed a function-by-function assessment of Mason's ability to sustain 20 different mental activities during a normal workday and workweek (Tr. 527–28).   He indicated that Mason was moderately restricted in her ability to understand and remember detailed instructions and markedly restricted in her ability to carry out those instructions; he further determined that Mason was moderately restricted in her ability to respond appropriately to changes in the work setting (Tr. 527–28).   Even though Mehr previously opined that Mason was moderately limited in maintaining social functioning, he found that she was not significantly limited in any mental activities related to social functioning (Tr. 528).

After completing the function-by-function assessment, Mehr translated his findings into a specific RFC, opining that Mason was capable of: understanding and remembering instructions for simple, routine, repetitive jobs; maintaining sufficient attention and concentration to persist at and complete work activities for the period of time required of the general work force; maintaining adequate pace and endurance; performing at common minimally acceptable rates; accepting instruction and supervision; tolerating the type of interaction required for training; and getting along with coworkers.

**D.     Vocational Expert's Testimony**

Following Mason's testimony at the evidentiary hearing on February 28, 2012, a vocational expert (VE) testified.   The ALJ asked the VE a series of hypothetical questions. The first question required the VE to assume a person who was able to do work at the light exertional level, with the following postural limitations:

- Occasional climbing ladders, ropes, and scaffolds;
- Occasional stooping; and
- Occasional reaching overhead on the non-dominant left side.

(Tr. 63).   The ALJ then parroted the RFC assessment of the non-examining consultant, Joseph Mehr, and added: "So I'm limiting the individual to simple, routine, repetitive tasks given moderate limitations in concentration." (Tr. 64).   The VE testified that this hypothetical person could perform her past job as a cashier (Tr. 64–65).

For the second and third hypothetical questions, the ALJ asked the VE to assume the same hypothetical person, but with two additional limitations:

- Must be able to sit and stand at will at her workstation provided she was not off task more than 10% of the workday; and
- Must be limited to low-stress work defined as no more than occasional decision making and occasional changes in the work setting.

(Tr. 65, 66).   The VE testified that this hypothetical person could not perform any of her past jobs, but there were unskilled occupations that exist in significant numbers in the local area that the person could perform, such as marker, router, and stock assistant (Tr. 65–66).

The VE further testified that the hypothetical person would be precluded from working at the unskilled, light level if:

- She had mood swings that would lead her to be off-task at least 20% of the day; or
- She was consistently absent from work one or two days per month

(Tr. 67, 68).

## THE DECISION OF THE ALJ

ALJ Nagle followed the five-step analytical framework outlined in 20 C.F.R. § 416.920(a)(4).   At step one, the ALJ determined that Mason had not engaged in substantial gainful activity since she applied for benefits on July 26, 2010 (Tr. 19).   At step two, the ALJ found that Mason had the severe impairments of back pain, mood disorder, and anxiety disorder, and the non-severe impairment of headaches (Tr. 19).   At step three,

the ALJ determined that Mason's impairments did not meet or equal Listing 1.04 for disorders of the spine, Listing 12.04 for affective disorders, or Listing 12.06 for anxiety related disorders (Tr. 20–24).

The ALJ then determined that Mason had the residual functional capacity to perform work at the light exertional level, except that she must be able to sit or stand alternatively at will at her workstation; she can only occasionally balance, climb ladders, ropes, or scaffolds, and reach overhead on the left; she must be employed in a low stress job requiring no more than occasional decision making and occasional changes in the work setting; and she is limited to simple, routine, repetitive tasks (Tr. 24).   At steps four and five, based on the testimony of a vocational expert, the ALJ concluded that Mason could not do her past work, but she could perform other jobs which exist in significant numbers in the national and local economy.   As a result, Mason was not disabled.

## ISSUES RAISED BY PLAINTIFF

In her brief (Doc. 18), Ms. Mason raises the following issues:

1.  The ALJ erred at Step 3 in determining that Mason did not meet a listed impairment;

2.  The ALJ erred in assessing Mason's residual functional capacity; and

3.  The ALJ erred in assessing Mason's credibility.

## ANALYSIS

Within each of the broad issues raised by Mason and listed above are a number of sub-arguments based on a variety of purported errors made by the ALJ.   The Court has carefully reviewed each of Mason's arguments and the commissioner's responses. Mason's strongest argument is that the ALJ did not properly evaluate the medical opinions in the record regarding the severity and limiting effects of her mental impairments.   This

error in turn led to other errors, which together serve to undermine the ALJ's determination that Mason was not disabled, and necessitate remand of this matter for further proceedings.

**A.    Evaluation of the Medical Opinions Regarding Mason's Mental Impairments**

The ALJ considered three medical opinions: (1) the Mental Function Capacity Report completed by Mason's treating counselor, Ms. Proctor, and one of her treating psychiatrists, Dr. Bearelly ("the treating sources"); (2) the report completed by Jerry Boyd, Ph.D., the examining state agency consultant; and (3) the Psychiatric Review Technique form and Mental RFC Assessment completed by Joseph Mehr, Ph.D., the non-examining state agency consultant.   The treating sources' opinion, if credited, would compel a finding that Mason is disabled.   However, the ALJ determined that the treating sources' opinion deserved "little weight," while the examining consultant's opinion deserved "some weight," and non-examining consultant's opinion deserved "great weight" (Tr. 27–28).   Although she did not explicitly say so, the ALJ essentially rejected the treating sources' opinion and relied on the non-examining consultant's analysis in determining the severity of Mason's impairments at Step 3 and her mental RFC.

The opinion of a treating source generally is entitled to controlling weight if it is supported by medical findings and not inconsistent with other substantial evidence in the record.   *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) (citing *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008)).   Even when the opinion is not entitled to controlling weight, it is "still entitled to deference" and cannot simply be rejected.   Social Secrutiy Ruling 96-2P, 1996 WL 374188, at *4 (July 2, 1996) ("S.S.R. 96-2P").    "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."   *Id.*

Page 17 of 28

If a treating source's opinion is not entitled to controlling weight, the ALJ must determine what weight to give that opinion, as well as any other medical opinion in the record, using the factors provided in the federal regulations.   *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (internal citations omitted); 20 C.F.R. § 416.927(c).   These factors include the length, nature, and extent of the treating relationship and the frequency of examinations; the supportability and consistency of the opinion with the record as a whole; whether the physician is a specialist; and any other factors the claimant or others bring to the ALJ's attention.   *Moss*, 555 F.3d at 561 (internal citations omitted); 20 C.F.R. § 416.927(c).   If the ALJ discounts the opinion of a treating source, the ALJ must offer "good reasons" for doing so.   *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).   *See also Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection."); S.S.R. 96-2P at *4 ("[D]ecision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the [opinion] and the reasons for that weight.")

Here, while the ALJ did not explain as much, the treating sources' opinion was not entitled to controlling weight because it was contradicted by the report of the non-examining consultant.[3]   Therefore, "the presumption falls out and the checklist comes

---

[3] There may be an additional reason that the opinion is not entitled to controlling weight.   The opinion appears to have been authored by Ms. Proctor and then co-signed by Dr. Bearelly.   Ms. Proctor is not an "acceptable medical source" under the federal regulations, and therefore her opinion is not entitled to controlling weight.   *See* 20 C.F.R. §§ 416.913, 416.927.   However, the Social Security Administration has instructed that her opinion is nevertheless important and should be considered and evaluated using the same checklist of factors for weighing the opinions of acceptable medical sources.   Social Security Ruling 06-03P, 2006 WL 2329939, at *4–5, 6 (Aug. 9, 2006); *see* 20 CFR § 416.913(a) (explaining evidence from other medical sources "may" be used to

into play." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).   Given that Ms. Proctor and Dr. Bearelly were both treating sources who examined Mason over an extended period of time, the checklist required the ALJ to give great weight to their evidence unless it was seriously flawed.   *Id.*   The ALJ claimed that a number of purported flaws in the treating sources' opinion justified giving it "little weight."   She attacked the opinion as "vague and imprecise" and noted that there was no "function-by-function analysis" (Tr. 28).   She also claimed that the opinion was "internally inconsistent and not supported by the medical evidence of record" (Tr. 28).   However, a review of the record reveals that the ALJ's reasons for discounting the treating sources' opinion were perfunctory and superficial.

### 1. Supportability of the Treating Sources' Opinion

The ALJ's assertion that the treating sources' opinion was vague and imprecise is essentially a finding regarding the supportability of that opinion.   In other words, according to the ALJ, the treating sources' findings lacked explanations and objective grounding in the treatment notes.   This conclusion is not factually or legally sound.   First, there is no legal authority that requires a treating source to express his or her opinion regarding the claimant's functional capacity on a function-by-function basis.   *See Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009).   Second, the treating sources' opinion was a form report that consisted mostly of check-box style questions, and the questions did not invite further explanation or include space for comments (*See* Tr. 864–65).   *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).   That being said, each of the questions regarding mental limitations elaborated on what was meant by a marked limitation, and Ms. Proctor and Dr. Bearelly left a general explanation for their opinion in the space provided at the end of the report (*See* Tr. 864–65).   Finally, there is no indication that the

show the severity of claimant's impairment and how it affects their ability to work).

ALJ read the opinion in conjunction with the medical records.   *See Larson*, 615 F.3d at 751 ("Although by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records.")   There are hundreds of pages of treatment notes and other medical records from Ms. Proctor and Dr. Bearelly, as well as various other medical professionals, that appear to corroborate their opinion about Mason's mental limitations.   *See supra* pp. 9–13.

The Court is particularly troubled by ALJ's unsound portrayal of the treating sources' opinion as unsupported because the ALJ said nothing about the supportability of the non-examining consultant's opinion on which she relied.   That consultant offered very little explanation for his conclusion that Mason remained capable of some types of work. He stated "This 34 year old woman with a history of bipolar disorder and anxiety is oriented, free of marked memory impairment, and is mostly independent in activities of daily living" and also that "she is noted to have reduced stress tolerance" (Tr. 529).   That is it.   He did not articulate how those facts supported his belief that Mason retained sufficient memory, attention, concentration, persistence, pace, and social skills to perform simple jobs or a routine and repetitive nature.   Nor did he acknowledge vast swaths of the medical record that appear to be inconsistent with his opinion.   Simply put, the explanations in the treatment notes of Ms. Proctor and Dr. Bearelly are much more extensive than the few sentences the non-examining consultant offered to explain his conclusions, yet the ALJ adopted the opinion of the consultant.

### 2.  Consistency of the Treating Sources' Opinion with the Record as a Whole

The Court turns next to the ALJ's claim that the treating sources' opinion was "internally inconsistent and not supported by the medical evidence of record."   In support of this finding, the ALJ gave one explicit example of evidence which she claimed was

inconsistent with the opinion as a whole.  In particular, the ALJ pointed out that the treating sources assigned a GAF score of 57, indicating *moderate* symptoms or impairment, [4] one month prior to issuing their opinion that Mason was *markedly* or *extremely* limited in all domains of mental functioning (Tr. 28, 864–65).   The ALJ further claimed that the treating sources' opinion was similarly inconsistent with the GAF score of 50 assigned by the examining consultant in September 2010, which suggested "serious but not disabling symptoms" (Tr. 25).

However, the latter conclusion regarding the GAF score of 50 is flat out wrong.   The Seventh Circuit has previously explained that "[a] GAF rating of 50 does not represent functioning within normal limits. Nor does it support a conclusion that [the claimant] was mentally capable of sustaining work."  *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010).   Therefore, a GAF score of 50 does in fact suggest disabling symptoms, and is completely consistent with the treating sources' opinion.   As for the former conclusion that the GAF score of 57 is inconsistent with the treating sources' opinion, that conclusion is not valid under Seventh Circuit law.   A GAF score "does not reflect the clinician's opinion of functional capacity."  *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).   It is nothing more than a snapshot of an individual's condition on one particular day.  *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).   "A person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition."  *Id.*   Simply put, for Ms. Proctor and Dr. Bearelly, the GAF score of

---

[4] The ALJ incorrectly stated that a GAF score of 57 "indicat[es] serious, but not marked impairment with the claimant's function" (Tr. 28).   On the GAF scale, a score between 60–51 actually indicates *moderate* symptoms or impairment, while a score between 50–41 indicates serious symptoms or impairment (*See, e.g.,* Tr. 563).   DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000).

57 was only one piece of data that they factored into their ultimate opinion.   The ALJ needed to analyze whether the opinion was consistent with the treatment notes as a whole, and Mason's range of GAF scores over time, not one GAF score cherry-picked from the medical file.   *Id.*

Accordingly, the ALJ's reason for discounting the treating sources' opinion as a whole is not sustainable.   The Court will next consider whether the ALJ gave good reasons for discounting the treating sources' specific findings.

### a.  Activities of Daily Living

The treating sources opined that Mason was markedly limited in activities of daily living, and the ALJ claimed this finding was inconsistent with the GAF scores of 57 and 50. Again, for the same reasons the Court just explained, this is not a "good" reason to discount this particular finding.   The ALJ also cited to a treatment note from December 2010 in which Mason's "therapists found her completely independent in daily activities except for house care at that time" (Tr. 21–22).   The treatment note the ALJ cited to was from Dr. Pat Kinne, a psychiatrist whom Mason saw on only one occasion, and simply states "Level of functioning: Independent, needs help with house cleaning, husband helps" (Tr. 589). However, the ALJ either entirely ignored or, at a minimum, failed to mention medical evidence that supports the treating sources' opinion.   In particular, there are a number of treatment notes and assessments from Ms. Proctor, the long-time treating therapist, regarding Mason's daily living and self-care skills (Tr. 558, 586, 913, 915, 923, 924, 929). There are some general statements, much like the one in Dr. Kinne's note, and there are also some detailed assessments of Mason's daily living and self-care skills—both of which are largely consistent with the treating sources' opinion.   "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a

finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected.")   Because the ALJ failed to mention or analyze relevant evidence that contradicted her decision to discount the treating sources' opinion regarding Mason's impairment in performing activities of daily living, that decision cannot be upheld.

### b.  Social Functioning

The treating sources opined that Mason was markedly limited in social functioning; given a very generous reading, the ALJ's decision appears to suggest that this opinion was inconsistent with the evidence.   In particular, the ALJ noted that Mason had "no significant social or emotional issues" with her husband.   The ALJ further suggested that any problems Mason did have were due to situational stressors, such as her husband's extended working hours and financial problems, not her mental impairments (Tr. 26).   It is difficult to fathom how the ALJ determined that Mason has no issues with her husband when the record is replete with references to Mason's ongoing, and sometimes intense, conflicts with her husband (Tr. 305, 312, 326, 327, 330, 341, 543, 562, 577, 586, 720, 907, 920, 923, 924, 937).   For example, statements in the psychiatric records include: "separated from husband" (Tr. 305); "divorcing husband" (Tr. 312); "her marriage is not good because she does not see eye to eye with her husband" (Tr. 543); "It appeared that her relationship with her husband is not going well" (Tr. 586); "She went on to talk about stress related to her relationship with her husband" (Tr. 920); and "severe conflict with husband" (Tr. 937).   In light of this evidence, it seems that rational minds would have a difficult time concluding that Mason had "no significant social or emotional issues" with her husband.

Furthermore, no doctor opined that Mason's conflicts with her husband were just a response to situational stressors as opposed to evidence of her chronic mental impairments.  Rather, it appears that Mason's problems with her husband are part and parcel of her mental impairment, and made even worse by situational stressors.

The ALJ also noted that Mason "is social with her mother, with whom she speaks with [sic] at least several times a month;" that Mason "leaves the house at least three times a day to walk her dog and shops without any mention of problems doing so;" and that Mason was "reported as being 'polite' with [her] therapist indicating a pleasant social demeanor" (Tr. 26).  However, there are several significant problems with the ALJ's insinuation that this evidence contradicts the treating sources' opinion.

First, the ALJ made no mention of the numerous references in the record to Mason's repeated issues with her mother throughout her lifetime (Tr. 332, 333, 337, 340, 495, 496, 579, 583).[5]  Furthermore, the ALJ did not provide any explanation for her belief that the fact that Mason speaks with her mother a handful of times every month was inconsistent with the treating sources' opinion that she was markedly limited in social functioning.   The same goes for the fact that Mason takes her dog to the bathroom, goes to the store once or twice a month without incident, and was polite to her psychiatrist during one 25-minute appointment.   These facts show that Mason's mental impairments have not rendered her homebound and completely unable to handle the most mundane and familiar social situations.   *See Bauer v. Astrue*, 532 F.3d 606, 608–09 (7th Cir. 2008) ("This is just to say that the plaintiff is not a raving maniac who needs to be locked up.")   They say little, if

---

[5] Statements in the psychiatric records regarding her mother include: "mom drives me nuts" (Tr. 579); "My anxiety is really up . . . my mom has a lot to do with that" (Tr. 583); "mom man-handled her once two weeks ago. Pt. is moving out of her mother's house" (Tr. 496); "mother kicked me and Kaylee (daughter) out onto the streets" (Tr. 340).

anything, about her ability to appropriately interact at work with the public, her co-workers, and her supervisors on a sustained and continuous basis. *See Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("[H]er ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace.")

Finally, the ALJ yet again ignored evidence that supports the treating sources' opinion. For example, there was no mention in the ALJ's decision of the numerous treatment notes about Mason's mood swings, irritability, avoidant characteristics, and tendency to isolate herself—all qualities which undoubtedly impair Mason's ability to function socially. *See, e.g., supra* pp. 9, 12. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected.")

For these reasons, the ALJ's decision to discount the treating sources' opinion regarding Mason's impairment in social functioning cannot be upheld.

### c. Concentration, Persistence, and Pace

The treating sources opined that Mason was extremely limited in concentration, persistence, and pace. The ALJ's decision appears to suggest that this opinion was inconsistent with the evidence of Mason's daily activities on her "high days," which included cooking, cleaning, laundry, self-care, and driving her daughter to and from the bus stop. Again, there are a couple significant problems with the ALJ's assessment of the evidence.

First, the ALJ did not consider *how* Mason copes with and carries out her daily activities on "high" days. *See Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). The uncontradicted evidence establishes that on "high" days, Mason was highly agitated, had trouble concentrating, and had to rest for 15 to 20 minutes between chores. Furthermore,

the ALJ failed to consider Mason's daily activities during her depressive episodes and the frequency with which Mason experiences those episodes.  *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (criticizing ALJ's decision for concentrating on the claimant's daily activities on her one or two good days each week); *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (criticizing ALJ's finding that "Martinez's severe depression is well controlled by drugs—when she takes them—but ignor[ing] the fact that during manic spells Martinez had stopped taking her medications"); *Bauer v. Astrue,* 532 F.3d 606, 608–09 (7th Cir. 2008) ("Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.")  The uncontradicted evidence establishes that Mason has a "high" day only a fraction of the time.

Simply put, the fact that Mason performed minimal daily activities on her own time, at her own pace during a fraction of her days is not necessarily inconsistent with the treating physicians' opinion that she is extremely limited in her overall ability to maintain concentration, persistence, and pace.  *See Spiva v. Astrue*, 628 F.3d 346, (7th Cir. 2010) ("But  an ability to engage in 'activities of daily living' (with only mild limitations) need not translate into an ability to work full time."); *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002) ("[I]nvolvement in 'minimal' daily activities does not necessarily contradict a claim of disability.")  For these reasons, the ALJ's decision to discount the treating sources' opinion regarding Mason's impairment in concentration, persistence, and pace cannot be upheld.

In sum, the ALJ's determination that the treating sources' opinion was inconsistent with the evidence is deeply flawed.  At times, the ALJ ignored particularly relevant evidence, made unsupported and irrational inferences about other evidence, and failed to include an adequate discussion.  Furthermore, the ALJ made no effort to explain how the

non-examining consultant's opinion was more consistent with the evidence than the treating sources' opinion.   It appears to the Court that the non-examining consultant's opinion is at odds with the medical evidence as a whole, and neither the consultant nor the ALJ gave the Court any reason to think otherwise.

To conclude, the ALJ failed to give good reasons for discounting the treating sources' opinion, and therefore that decision cannot be upheld.   Additionally, the ALJ failed to even mention, let alone evaluate, the treating sources' opinion that Mason was likely to be absent from work more than three times a month on average (Tr. 865).   This issue is critical because the VE testified that Mason would be precluded from all work if she was consistently absent one to two days per month (Tr. 68).   Because the ALJ's evaluation of the treating sources' opinion is unsound, the Court is precluded from meaningfully reviewing the ALJ's conclusion that Mason did not meet a listed impairment, the assessment of Mason's credibility, and the assessment of Mason's RFC.   This matter must be remanded for reevaluation of the treating sources' opinion.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mason is disabled or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

Lee Ann Mason's motion for summary judgment is **GRANTED**.   The Commissioner's final decision denying Mason's application for Supplemental Security Income benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and

reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of Plaintiff Lee Ann Mason.

**IT IS SO ORDERED.**

**DATE:** August 7, 2014

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**